May it please the Court, Elphiga Regé on behalf of Appellants Charles Liu and his wife Lisa Wang. With the Court's permission, I would like to reserve two minutes for rebuttal. Sure. The EB-5 program creates a market in which the investors seek to get United States citizenship. The fund managers look to raise capital at the lowest cost possible. The United States gains employment and economic development. There is no requirement in the regulations that the instrument that commits the investors to investing be security under the securities laws. The requirement is that the funds be at risk for a return. Well, they were at risk here, were they not? They were, Your Honor. Your argument, as I understand it, is that the profit anticipated in the offering memorandum was not sufficient to rise to the level of a security. And my question is, how are we supposed to know where to draw that line in determining what profit is necessary to constitute a security? I think the line has been drawn by this Court's Warfield opinion. And that opinion defines a security based on the Supreme Court's Howery opinion, and it focuses on the third factor of Howery. There must be an expectation of profits, and the investors must rely entirely on the efforts of others. Here, the argument is that there could not have been an expectation of profit when the investor was told at the beginning this was an investment with a guaranteed loss. If the project succeeded, the investor would gain on half a million dollars 1.5 percent over five years. Well, that's not a loss. It's just not much. Well, it's a nominal gain. It's a real loss when inflation is factored into it. Yeah, but what about what if you're in a deflationary economy? It could well be a significant gain. How are we supposed to determine, you know, what the motivation of an investor is based on are we supposed to use some historical benchmark? I just don't understand how we can do that. Well, I don't think that it's appropriate, if I may, for the court to determine the motivation of the investor. Well, I thought that's what your argument was, that their motivation here was not for profit but for the visa. Well, the argument is not the investor's subjective motivation. The argument is based upon the facts and the actions of the investors. The reasonable conclusion one can make is that the only reason why an investor would make this investment is for the United States' citizenship. If capital is needed for investment and the investment is meritorious on its own terms, investors will make that investment and the free market will allocate it and there will be a determination of the appropriate interest for that capital. In this instance, these investors were willing to accept 0.25% return on their capital annually at a time when inflation was running at about 2%. No rational investor would make that investment. All investors factor in the inflationary element in making their investment decision. Okay. I'm just troubled by that, but I think I understand your position. Thank you. So your position is that we as a court, we're supposed to just figure out whatever the inflation rate is as of the moment the investment was made, and then if it's $1 above that, then we count that as a security, but if the return is $1 below that, we don't? That's where we end up? I think what the court has to do is apply the standard that it announced in Warfield. And that standard says at the end of the day, for an instrument to be a security, it has to generate net financial gains. And it may be in different periods there will be different calculations of net financial gains. I think as your Honor, Judge Bresnell just noted, in deflationary period there will be different considerations. Do we have any, a single case that has factored in this inflationary rate of return that you're advocating? I haven't seen any. I am not aware of a case that has considered the inflationary rate. On the other hand, this is the first case in which a court of appeals is confronted with this issue. And the EB-5 unit is an unusual financial instrument. It is not the routine type of financial instrument. So the court has to evaluate the facts in a particular case and determine does it meet the Warfield standard. I submit on these facts, it does not. Now, if I may, I'd like to move on to my second argument, because I think even if the instrument is deemed to be a security, there's a fatal objection to this enforcement action. Chinese investors solicited in China make investments in China to finance the construction of a proton therapy project in California. I submit to the court that on those facts, there are not sufficient domestic transactions to warrant the application of U.S. securities laws. So let's hear your response to the government's argument that you forfeited any ability to raise this argument now, because you really never did make the argument that you're now trying to make in the district court. What's your response on that front? With due respect to the SEC's position and our reply, we pointed out we did indeed in April, pardon me, before the district court issued the opinion in April, two months before that, raise this precise issue. We pointed the district judge at the argument not only to the Supreme Court's latest opinion in the area, but to the leading case of Morrison. But below, don't you concede that your argument was not made with respect to Mr. Liu but only as to Wang? We do concede that, Your Honor. And why would you make the argument as to her but not him, because they would both get off the hook if you win that argument? I don't understand why you didn't make it for both of them. The charge with respect to the defendants in the district court involved both the 33 Act and the 34 Act. As Your Honor knows, under the 33 Act, an offer to sell a security would be sufficient. There were facts with respect to Mr. Liu regarding his action in the United States that raised different issues for him. As to his wife, Ms. Wang, the facts were entirely clear. Her conduct was entirely in China. Right. But your reliance on Morrison now, you did not cite Morrison below, did you? We did cite Morrison at the argument. We pointed the court to the transcript in which we specifically cited Morrison. In the briefing, we cited the Supreme Court's latest opinion in this area, which does, of course, cite Morrison. But at the argument, we did cite Morrison. What does Morrison even have to do with this case? I thought that case just dealt with where the securities were traded, where the exchange was located. That's not an issue here, right? So I don't even understand why it's such a who cares whether you cited Morrison or not. As I read it, that case has nothing to do with what we're trying to decide in this case. Well, as this court pointed out recently in its Toshiba opinion, there is language in Morrison that talks about a security, a domestic exchange. But the principle ruling, the substantive ruling of Morrison was, unless Congress makes it explicit, United States laws do not apply beyond the territory of the United States. So Congress has now made it explicit, right, via that amendment? Your Honor, I beg to differ with you. I think the SEC has argued that the Dodd-Frank amendment has now effectively repudiated Morrison. It has. I don't even understand what the argument is. Is it just that they used the word jurisdiction? Your whole argument rests on they used the wrong word? I think partly that, but also the context. Morrison came out of the Second Circuit as a jurisdictional case. Congress began the legislative process to repudiate the jurisdictional issue. The Supreme Court decided Morrison as a substantive case. It said the scope of the statute does not reach beyond our borders. Although that opinion was issued prior to the amendment in Dodd-Frank. Barely. Congress, barely. I don't think there's any way that you can say that Congress, you know, was responding to the Supreme Court's decision in Morrison. It was responding to the Second Circuit's decision, right? It was responding to the Second Circuit's decision, but Congress had the Supreme Court opinion before it finally enacted the bill. And the Supreme Court made it clear the federal courts already have jurisdiction to determine, to rule on transactions beyond its borders. The issue is has Congress authorized us to apply this particular statute beyond our borders? It hasn't in this case. Now, I do want to get briefly to the summary judgment decision. Your Honors, the district court conflated two different summary judgment standards and erred in making the ruling. The district court held that Lew was obligated to tell the investors that he's going to use capital, $12 million of capital to pay for marketers and compensation. That is the securities laws. Well, I don't know that he was obligated to say that. I think the problem is in that, I think it was the footnote that said basically commissions and the like are only going to be paid out of the administrative fee. That's the problem. Once he had said that, right, then if he was going to do something different from that, I think he was obligated, wasn't he, to tell people that actually, no, I'm going to use, you know, 80% of the principal you give me to squander away on other expenses. I think that's the problem as I see it. He was obligated. He did tell them. The POM from the beginning told them, yes, we're going to use only administrative fees to pay these costs. But Lew was granted absolute unreviewable discretion to reallocate the capital, not just the administrative fees, to pay anything that he wanted to do. That was in the POM. It's a real stretch to read the POM that way. It's the language of the document. It's the language of the document. We submit that a rational trial fact could read it that way in this context. Essentially, the investors were saying, we're going to put our money here. We're accepting .25% return, a guaranteed loss. We are entrusting you, Charles Lew, as the manager, to get us our U.S. citizenships. That was the objective of the project. That's why they gave him that discretion. District Court erred in concluding that it was a securities laws disclosure materiality issue and not a summary judgment materiality issue. Okay. Let's hear from the government, and you still have some time to reply. Thank you. Good morning, Your Honors. May it please the Court. I'm Carrie Dingell on behalf of the Securities and Exchange Commission, and with me today is my colleague Jeffrey Berger. I'd like to jump straight to the is this a security issue that you raised. I want to make it clear that Howey didn't say, and none of this Court's precedence has ever said, that the expected profit must reach a particular level or total a specific amount in order to count under the Howey test. So is it the case that, you know, if the promise here had been we'll pay you a dollar per year for each of the five years on your $500,000 investment that you would say, well, hey, that's a profit. Profit is a profit. Or is there some de minimis level which you just say, you know what, that doesn't even count? Your Honor, there is no de minimis level, and in particular here I think there are two reasons why the securities laws must apply. The first is that appellants themselves called these securities. Appellants claimed that they were offering them pursuant to Regulation D of the Securities Act and Commission Rule 501A. So they can't claim to be surprised now that they're being held liable for securities fraud because they were selling these as securities. Second, I think, you know, just to take a step back, the purpose of the Howey test is to determine whether the securities law should apply, and the Commission's enforcement efforts here fall squarely within the purpose of the Securities Act, which is to protect capital formation for U.S. profit-making enterprises. But I don't understand why if the promised rate of return is $1 per year on a $500,000 investment, why your agency would have any regard for, I mean, obviously in that scenario we know to a moral certainty that nobody is investing their money in that so-called investment to get a financial return. They're obviously motivated by something else that probably your agency has no interest in. So that's what I guess I don't understand. Well, for two reasons, Your Honors. The Commission is not only interested in protecting investors' ability to get a return. We also have an interest in protecting capital formation. So investors have all sorts of reasons why they might make investments, but the reason that we're concerned with the EB-5 program and that we've gotten involved in this space is because the whole purpose of the EB-5 program is to allow U.S. commercial enterprises to raise capital. And our goal is to protect capital formation. And I think that this Court's opinion— I thought your goal was to protect investors from getting ripped off by unscrupulous investment managers. Why I don't— That is one of our goals, Your Honor. And so let's just take it as a given. In my hypothetical where this investment is being offered, a dollar is the rate of return per year. We know that every single person who's investing in this is only interested in getting the visa. They could care less whether they— they could probably care less whether they lose the whole $500,000 actually, but they certainly are not coming— they're not looking out at the investment landscape and saying, boy, that's an attractive rate of return. Let me go with this, right? So in that scenario, why would your agency be concerned about whether folks, if they want to pay $500,000 and basically gambling their money on whether they're going to get this visa, why would you be concerned about that? Because it still protects capital formation. So if we permit people like appellants to sell things that they label securities and then commit fraud and steal investors' money, that affects foreign investors' willingness to invest in EB-5 enterprises. And so since that's a source of capital formation for U.S. businesses, that's where the commission's concern comes in. I'm looking for something analogous that would support your position. And back in the 80s, they had all these tax shelter schemes where basically you were guaranteed to lose money, but that loss could be used as a tax benefit. Are those cases analogous to what we're dealing with here? They could potentially be analogous, and I think that this Court's opinions leave open the possibility that even minimizing losses can count for an expectation of profit under the Howey test. So if you look at the LKM, the Equity Securities Corporation case, that case said that where the investor shared in the profits of the promoter, the investor shared in the profits of the promoter where only her risk of loss depended on the promoter's efforts and her potential gain did not. So moving on, if Your Honors have no further questions on that, to the extraterritoriality. Yes, I'm still trying to figure out the capital formation. Your agency's interested in that. Maybe you can take another run through that with me. I thought that the interest was solely in protecting investors, and I guess I just don't see why there's a secondary interest as well. I think the secondary interest is in the law itself, and if you look at the Supreme Court's opinions that have interpreted it, SEC v. AdWords, I think, refers to capital formation, and that's the case that held that a fixed rate of return could constitute a profit for Howey purposes. There's just really nothing in the securities laws that says that we're only concerned about investors' profits. The point of the securities laws, really, is that when investors part with their money and allow someone else to manage their money, there are certain risks that arise from that, and those risks are no different if you're parting with your money and want someone to minimize your losses and return your money in full than they would be if they offer you a dollar return. Take it you would say that the securities laws are designed to protect the dumb investors as well as the smart ones. Absolutely, Your Honor. I don't think any of these people are dumb. I think actually they're quite— I mean, the chance to get a visa, that's obviously not something you can purchase on the open market, so I think even if there was a 90 percent assurance that you were going to lose your $500,000 and not get any return, but you would nonetheless be successful after two years in getting a visa, I think that would still be a wise investment. That's correct, Your Honor, and I also think that in this case you don't even need to reach that question because they were promised a return. They were promised a return of 1.25 percent on their $500,000 capital contribution, and so if you line that up with the investment contract test, it was an investment of money, $500,000, in a common enterprise, the loan made from PPEB-5 Fund to Beverly Proton, with the expectation of profits, the 1.25 percent, based on the efforts of others, appellants and their partners. So every element of the investment contract test under Howey is met here, and there's simply no precedent for taking into account the rate of inflation in determining whether something is a security, nor would that be a workable test because you don't know what the rate of inflation will be ex ante. Well, you may have no inflation. You could have deflation, in which event 0.25 percent would be good. Exactly, Your Honor, and that also raises another issue where in some instances a zero return or a negative return might be attractive to investors because keeping their money in cash is actually riskier in scenarios like that than making an investment that doesn't provide a return, and no one has ever said that you don't have a security in that instance. Can I ask you just one more question before you move on? Is there like a market for these kinds of investments where folks like Mr. Liu and his wife, they're competing against other folks who are offering the same kinds of EB-5 opportunities? Yes, Your Honor, so there is a primary market. There are approximately 800 regional centers in the United States. They all have terms associated with their offerings, and so investors can look at those various offerings and decide which one they want to go with. There's no secondary market because these aren't traded on an exchange, but there is a primary market, and it's not an insignificant market. It's approximately $2 billion a year of capital formation. And does the rate of return vary, or everyone just offers the same? The rate of return varies. So I've seen, you know, I haven't looked at all of them, but I've seen everything up to 5% or 6%. So I think you look at, you know, obviously the risks associated with a particular project, and, you know, investors might have lots of reasons for picking one over the other, but there is a market and they do have choices. Okay, great, so you wanted to move on. So moving on to the extraterritoriality argument, so I believe you're correct that they did waive this argument below. They only argued that Ms. Wang didn't engage in any conduct within the United States. Well, didn't engage, didn't make any misrepresentations. Correct, but even more broadly, you know, if you look at whether she engaged in any conduct, that's irrelevant under either the Section 929 PB standard or Morrison. Did they raise Morrison below? He says it raised it in an argument. I haven't seen that. Only with, I believe at the summary judgment hearing, but only with respect to this argument that Ms. Wang didn't engage in any conduct here, and Morrison doesn't require her to have engaged in conduct here because Morrison looks at whether, well, in the Section 17A2 context, the offer or sale of the security occurred in the United States. So I think that they did waive that argument below, you know, but regardless, you know, we would argue that Section 929 PB should apply, but no matter which standard you choose, this is just clearly met. Either standard would be clearly met here. They were selling limited partnership interests from a U.S. company to build real property in the state of California, so the conducts and effects test is clearly met. And the triggering event, there's a lot of evidence in the record that can satisfy the Morrison standard, but for simplicity, I would just point the court to ER 1941, which is a page of the offering memorandum that outlines the subscription procedure, and it locates the triggering event as the filing of the I-526 petition. So in particular, it says, after filing of a subscriber's I-526 petition, that subscriber shall have no right to revoke or withdraw his or her subscription. So if that's not, you know, the point of irrevocable liability, I don't know what would be, and the I-526 petition was filed with USCIS, which is a U.S. federal agency. So regardless of which standard you apply, I think the standard is satisfied in this case. But it does matter that it was waived below because we've been able to find sufficient evidence in the record to satisfy either standard, but the commission was not under the impression that this was an issue, and so we didn't look to specifically, you know, develop evidence that the standards would be satisfied. And so it's, you know, very possible that there's a lot more evidence that could be developed on that point. So if the court has no further questions, we would ask you to affirm the district court's opinion in all respects. Thank you. Thanks very much. Before you go, because he may raise this in rebuttal, is the appellant's argument that the district court does not have equitable powers to order disgorgement. I don't know if that still is positioned or not, but you might want to comment on that. Sure. So, Your Honor, I think that this court recently, in FTC v. Dantuma, put that argument to rest and held that, you know, nothing in COCESH changed this court's prior opinions that said that district courts have power to require disgorgement ancillary to their power to issue injunctions. Well, footnote three in COCESH makes that plain. Precisely. Okay. And this court has already so held. All right. Thank you. Thank you, Your Honor. Is there a difference between disgorgement and equitable restitution? Are those just synonymous in your agency's view? Because I did think, I guess until I saw the order that the district court issued here, that there was a difference, that disgorgement did have to do with disgorging monies that you personally obtained wrongfully. Whereas I know in, like, the FTC cases that we've had, at least in the context where joint and several liabilities impose, you can be required to basically disgorge every penny that the fraudulent enterprise took in. I was surprised here to see that the individual was basically required to, quote, unquote, disgorge essentially every dollar that came in. So with respect to the, is the question with respect to the amount of disgorgement, whether that was appropriate? I'll answer your question, just the amount. So they, there's no question that they obtained approximately $27 million from investors. So the parties agree on how much they obtained from investors. And the district court held that they were required to disgorge that full amount. Now they claim that they are entitled to certain deductions for business, what they call business expenses. But the district court expressly looked at that and held that even those expenses were sort of part and parcel of the fraud. At ER-12, the district court said that Lou burned through millions of dollars he had left after payments to himself, Wong, and the marketers,  So expenses, even the expenses that they claim are legitimate, the district court determined that they were simply expenses to convey an illusion of progress. They were part and parcel of the fraud, and they also must be disgorged. Okay. And that covers even the, wasn't there a large payment, like, made on a down payment for the equipment itself? Yes, Your Honor, there was. Well, they have claimed that there was a down payment made on equipment. But, you know, if you look at this court's holding in Wallenbrock, there were real operating expenses that the defendants in that case paid. They were operating a Ponzi scheme, but they were operating expenses associated with it. They really paid, you know, attorneys and accountants and paid for the building that they were in. And this court refused to permit them to deduct those expenses because the entire enterprise was fraudulent. And here, you know, it's obvious that the entire enterprise was fraudulent because they had entered into agreements with the marketers before they even gave offering documents to the investors that violated the terms of the offering documents. So they knew from the start that they were misrepresenting the terms of the offer to the investors. Okay. Thank you very much. Thank you, Your Honor. Time for rebuttal, sir. Thank you, Your Honors. I'll start with disgorgement. One has to be precise about the definition of the term. We are not arguing that this court has no authority to award disgorgement. It may award disgorgement as an equitable remedy. Restitution may be equitable or legal. If disgorgement is awarded as a penalty, and it was here because it was awarded to vindicate a public statutory scheme, it was awarded as a deterrent purpose, and it was awarded to a public agency, it was not compensatory. It was not equitable in any sense. Well, disgorgement can be used for reasons other than to repatriate the money to the victims, correct? I mean, disgorgement often is used as a penalty. It is often used as a penalty, and that's why the Supreme Court in Kokesh went out of its way to disapprove it. The Supreme Court in Kokesh simply said that, in terms of the five-year statute of limitations, they would consider disgorgement in the context I'm talking about as a penalty. It was related, as I understand the opinion, was related only to the application of the five-year statute of limitations. Your Honor is absolutely correct. That is the holding of the case, and the Court made very clear in a footnote that it was not holding in that case that federal courts do not have authority to award disgorgements in these cases. Clearly, federal courts have no authority to award penalties. What the Supreme Court said was the disgorgement awarded in that case was a penalty. The reason why it was a penalty is because often disgorgement, although it could also be an equitable remedial program, can be awarded as a penalty, and it indicated the factors that courts should consider to distinguish disgorgement as a restitutionary measure and disgorgement as a penalty. For example, if I may, if a group of people go rob a bank, they steal $5 million, they can't later claim the cost of a car, the payment to the getaway driver, the lookout, or all business expenses. That is not, it's entirely wrongful to the bank. It's a violation of public law, and the entire sum should go back. Here we have someone who created a fund. He spent $5 million in expenses to get the fund started, including nearly $50,000 of his own money. This was not a Ponzi scheme. This was a legitimate business that he was trying to create and make happen so that his investors would get their U.S. visas and that he would build a proton therapy project in California. Well, the district court obviously had a different view of that. The district court absolutely did. I agree with you, Your Honor. If I may now address the issue of return. You're over your time, but very briefly. Yes, go ahead. Very briefly. Limited partnerships, limited interest partners have securities, but it doesn't mean that every limited partnership interest is a security. For example, counsel just conceded to the court, in some instances these EB-5 units have interest rates of 4% to 5%. Well, that would be an entirely different case for this court to decide. I'm asking this court to decide this case on its facts and to apply your well-established law to those facts. And I submit that the well-established law really says, in this instance, this EB-5 unit is not a security. It's not an investment contract. Okay. Thank you, counsel. Thank you, Your Honor. I appreciate the helpful arguments. The case just argued will be submitted.
judges: Watford, Owens, Presnell